AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Northern District of California

| | |
|---|---|
| United States of America )<br>v. )<br>YOBANI AMINADAB GALLARDO CASTRO )<br>(a/k/a/ "YUCA NOCHE," a/k/a "SINALOA"), )<br>)<br>)<br>)<br>_Defendant(s)_ | Case No.   3-23-mj-70807MAG |

**FILED**
Jun 02 2023
Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of   June 2, 2023   in the county of   San Mateo   in the
Northern   District of   California   , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) and 841(b)(1)(C) | Possession with intent to distribute cocaine<br><br>Maximum penalties:<br>• Imprisonment: 20 years (21 U.S.C. § 841(b)(1)(C))<br>• Fine: $1 million (21 U.S.C. § 841(b)(1)(C))<br>• Supervised Release: Min. 3 years – Max. life (21 U.S.C. § 841(b)(1)(C))<br>• Special Assessment: $100 (18 U.S.C. § 3013(a)(2)(A))<br>• Forfeiture: 21 U.S.C. § 853(a) \| Deportation \| Denial of Federal Benefits |

This criminal complaint is based on these facts:

Please see the attached affidavit of DEA SA Connor R. Hooper

☑ Continued on the attached sheet.

Approved as to form /s/ Nicholas M. Parker
AUSA Nicholas M. Parker

/s/ Connor R. Hooper
*Complainant's signature*

DEA SA Connor R. Hooper
*Printed name and title*

Sworn to before me by telephone.

Date:   06/02/2023

*Judge's signature*

City and state:   San Francisco, California     Hon. Sallie Kim, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Connor R. Hooper, a Special Agent of the Drug Enforcement Administration, being duly sworn, hereby declare as follows:

## INTRODUCTION AND PURPOSE OF AFFIDAVIT

1.	I make this Affidavit in support of an application under Rule 4 of the Federal Rules of Criminal Procedure for a criminal complaint and arrest warrant charging **Yobani Aminadab GALLARDO CASTRO (a/k/a/ "YUCA NOCHE," a/k/a "SINALOA")**, with one count of possession with intent to distribute a mixture or substance containing a detectable amount of cocaine, in violation of Title 21, United States Code, Section 841(a)(1) and (b)(1)(C), on or about June 1, 2023, in the Northern District of California.

## SOURCES OF INFORMATION

2.	Because this Affidavit is submitted for the limited purpose of securing a criminal complaint and arrest warrant, I have not included every fact known to me concerning this investigation. Instead, I have set forth only the facts necessary to establish probable cause that the violations of federal law identified above have occurred.

3.	I have based my statements in this Affidavit on my training and experience, personal knowledge of the facts and circumstances obtained through my participation in this investigation, information provided by other agents and law enforcement officers, and information provided by records and databases. I believe these sources to be reliable. Where I refer to conversations and events, I refer to them in substance and in relevant part rather than in their entirety or verbatim, unless otherwise noted. This Affidavit also reflects my current understanding of facts relating to this investigation, but my understanding may change in the future as the investigation proceeds.

## AFFIANT BACKGROUND

4.	I am a Special Agent with the DEA assigned to the DEA San Francisco Divisional Oakland Resident Office in Oakland, California, and have been so employed since July 2019.

1

5. As a Special Agent of the DEA, I am an investigator and law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7). I am empowered by law to conduct investigations, to execute search warrants, and to make arrests for offenses of federal law, including drug offenses. I investigate narcotics and related offenses.

6. My training included a seventeen-week DEA Basic Agent Training Academy at the DEA Academy in Quantico, Virginia. This training included instruction in the investigation of federal drug violations, including, but not limited to, 21 U.S.C. §§ 841 and 846. Additionally, this training included several hundred hours of comprehensive, formalized instruction in, but not limited to, narcotics investigations, drug identification, detection, interdiction, financial investigations and money laundering, informant handling, law classes, report writing, identification and seizure of drug related assets, undercover operations, and electronic and physical surveillance procedures.

7. During the course of my employment as a DEA Special Agent, I have participated in over 30 narcotics investigations either as a case agent or in a supporting role. I have debriefed defendants, confidential sources, and witnesses who had personal knowledge regarding narcotics trafficking organizations. I also have participated in many aspects of drug investigations including, but not limited to, undercover operations, telephone toll analysis, records research, and physical and electronic surveillance. I have assisted in court-ordered wiretap investigations, and I have participated in the execution of numerous federal and state narcotics search and arrest warrants that resulted in the arrest of suspects and seizure of narcotics.

8. Through my training, education, experience, and my conversations with other experienced agents and officers who conduct drug investigations, I have become familiar with narcotics traffickers' use of mobile telephones and mobile telephone applications, Internet applications, social media applications, as well as narcotics traffickers' use of code words to conduct business. I have become familiar with narcotics traffickers' methods of operation, including, but not limited to, the manufacturing, distribution, storage, and transportation of

narcotics, and the methods used by drug traffickers to collect, transport, safeguard, remit, and/or launder drug proceeds.

9. During the course of my law enforcement career, I have been involved in investigations of numerous federal and state criminal offenses. I have participated in numerous investigations of illicit drug trafficking organizations, ranging from street level dealers to major drug trafficking organizations ("DTO"). These investigations have included the use of confidential sources ("CS"), undercover agents ("UC"), and sources of information ("SOI") (collectively "Sources"). These investigations have also included the unlawful importation of, possession with intent to distribute, and distribution of controlled substances, the related laundering of monetary instruments, the conducting of monetary transactions involving the proceeds of specified unlawful activities, and conspiracies associated with criminal narcotics offenses, etc. These investigations have resulted in numerous state and/or federal prosecutions of individuals who have possessed, imported, or distributed controlled substances, as well as the seizure of those illegal drugs and the proceeds from the sale of those illegal drugs.

10. I have been involved in the execution of numerous federal and/or state narcotics-related search warrants. As a result, I have encountered and become familiar with the various tools, methods, trends, paraphernalia, and related articles used by drug traffickers and trafficking organizations in their efforts to import, conceal, manufacture, and distribute controlled substances. I am familiar with the appearance of heroin, cocaine, methamphetamine, marijuana, MDMA, and other controlled substances. I am familiar with and aware of the terminology used by narcotics traffickers concerning narcotics and narcotics dealing.

11. I have interviewed numerous drug dealers, users, and confidential informants, and have discussed with them the lifestyle, appearances, and habits of drug dealers and users, the use and meaning of coded language and the concealment of assets. I have become familiar with the manner in which narcotics traffickers smuggle, transport, store, and distribute narcotics, as well as how they collect and launder drug proceeds. I am also familiar with the manner in which narcotics traffickers use telephones, cellular telephone technology, pagers, coded or slang-filled

telephone conversations, false or fictitious identities, and other means to facilitate their illegal activities and thwart law enforcement investigations.

12.     During my time at DEA, I have initiated and participated in Organized Crime Drug Enforcement Task Force (OCDETF) investigations. The OCDETF program is part of the United States Attorney General's drug strategy to reduce the availability of drugs by disrupting major trafficking organizations through joint-agency collaboration.

13.     I have participated in approximately five investigations in which court-authorized Title III interceptions were used in narcotics and/or money laundering investigations. During these investigations, I have listened to and deciphered conversations between narcotics traffickers in which they discussed their criminal activities in coded language or intentionally vague language, and which were later corroborated by surveillance or defendants' statements. I have also interviewed several drug traffickers after their arrest, as well as confidential sources, and discussed with them the meaning of the coded language they used during the course of the commission of drug and money laundering offenses. During these interviews, the arrested drug traffickers and confidential sources have explained to me how they use coded language to conceal the true nature of their conversations from law enforcement and anyone who may be listening or overhear the conversation. As a result, a person who did not know the code or their meaning would think the individuals were having an innocent conversation or would be confused by the conversation since it would not make sense to that person.

14.     Before joining DEA, I was Police Officer for the City of Chicago. As part of my official duties as a Chicago Police Officer, I responded to 911-dispatched calls involving homicides, gang and domestic violence, drug trafficking, emergencies, traffic accidents, and other criminal activity. I arrested numerous individuals, to include drug traffickers, on misdemeanors and felony charges. In addition, I collected preliminary investigation information as a first responder to crime scenes. I conducted over 100 traffic stops, while also issuing citations and mandatory court appearances. I organized and wrote reports related to arrests, investigatory stops, and other observed incidents. In this role, I also participated in the execution

of multiple state issued search warrants, and testified in the State of Illinois Circuit Court of Cook County. I collected and processed evidence to include firearms and narcotics. I interviewed violent offenders and drug traffickers, as well as obtained testimony from witnesses and/or victims.

15. I have personally participated in the investigation discussed in this affidavit. I am familiar with the facts and circumstances of the investigation through my personal participation. I have also learned other things about this investigation from fellow law enforcement officers and agents. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by a DEA agent or task force officer, law enforcement officer, or witness who may have had either direct or hearsay knowledge of that statement and to whom I or others have spoken, or whose reports I have read and reviewed. Such statements are among many statements made by others and are stated in substance and in part unless otherwise indicated. Because this affidavit is being submitted for the limited purpose of showing that there is sufficient probable cause for the requested warrant, I have not set forth everything I know about this investigation.

### APPLICABLE STATUTES AND JURISDICTION

1. Title 21, United States Code, Section 841(a)(1) and (b)(1)(C) prohibit any person from knowingly or intentionally possessing with intent to distribute a mixture or substance containing a detectable amount of cocaine. Cocaine is a Schedule II substance under the Controlled Substances Act.

2. The elements of a violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) are as follows: (i) the defendant knowingly possessed with intent to distribute a mixture or substance containing a detectable amount of cocaine; and (ii) the defendant knew that the substance he possessed with intent to distribute was or contained cocaine or some other federally controlled substance. "Distributing" means delivering or transferring possession of fentanyl to another person, with or without any financial interest in that transaction.

# FACTS ESTABLISHING PROBABLE CAUSE

**A.     Overview of Investigation**

1.      The Drug Enforcement Administration ("DEA"), Oakland Resident Office, is investigating the drug trafficking activities of GALLARDO CASTRO—who is also known (and referred to throughout this affidavit) by the alias "YUCA NOCHE" and the alias "SINALOA" and who uses a cell phone assigned call number (510) 491-6101—and certain of his known and as-yet unknown co-conspirators, including Darwin AVILA-DIAZ, who uses a cell phone assigned call number (415) 879-0253 ("TT1"). Based on the investigation conducted so far, agents have learned that AVILA-DIAZ is a mid- or street-level poly-drug distributer who regularly commutes to the Tenderloin district of San Francisco to distribute narcotics. Agents believe GALLARDO CASTRO is one of AVILA-DIAZ's drug suppliers.

**B.     Agents Intercept Calls Between GALLARDO CASTRO and AVILA-DIAZ**

2.      Toll analysis on TT1, which is used by AVILA-DIAZ, and the phone number used by GALLARDO CASTRO ((510) 491-6101) shows that, between April 14, 2023, and May 5, 2023, there were approximately 66 phone calls and approximately two SMS text messages between GALLARDO CASTRO and AVILA-DIAZ.

3.      On May 11, 2023, the Hon. Edward J. Davila, in No. CR23-90895 MISC EJD, issued an order authorizing the interception of wire and electronic communications to and from TT1, which is currently being used by AVILA-DIAZ.

4.      As set forth in the affidavit filed in support of the application that led to the issuance of the Court's order in No. CR23-90895,[1] and as summarized herein, TT1 is being used to traffic in narcotics, including fentanyl, heroin, and cocaine.

5.      On May 12, 2023, pursuant to the Court's order in No. CR23-90895, the DEA began intercepting wire and electronic communications to and from TT1.

---

[1] I incorporate herein the affidavit filed in support of the application (the "Wiretap Affidavit") that led to the issuance of the Court's order in No. CR23-90895.

6

6.     On May 15, 2023, at approximately 5:01 p.m., a call from TT1, used by AVILA-DIAZ, to (510) 491-6101, used by YUCA NOCHE, was intercepted and recorded (TT1, Call No. 16673). The conversation between YUCA NOCHE and AVILA-DIAZ occurred in Spanish and lasted for almost 19 minutes. A partial summary of the call, which was translated to English by a DEA-employed linguist, is as follows[2]:

> YUCA NOCHE asked what was up. AVILA-DIAZ asked if YUCA NOCHE had cooked (possibly narcotics) already. YUCA NOCHE said no. AVILA-DIAZ asked why. YUCA NOCHE said because he (YUCA NOCHE) did not have any (possibly narcotics). AVILA-DIAZ told YUCA NOCHE the dude (third party, possibly other source) was left without any product (possibly narcotics). YUCA NOCHE asked for clarification, AVILA-DIAZ repeated that the dude (third party) was left with no product (possibly narcotics). YUCA NOCHE said he (YUCA NOCHE) was waiting and said they (fourth parties) were going to bring him (YUCA NOCHE) 3 kilos (possibly narcotics) and that dude (third party) only bought 1 kilo. AVILA-DIAZ said yes, because that dude (third party) [U/I] 2 [U/I] (possibly trips). AVILA-DIAZ told YUCA NOCHE he (AVILA-DIAZ) had 3 (possibly orders for) whole ones for tomorrow. YUCA NOCHE said cool. AVILADIAZ said that if YUCA NOCHE got on it, he (YUCA NOCHE) would sell that shit (possibly narcotics) quickly with him (AVILA-DIAZ). AVILA-DIAZ said that was if YUCA NOCHE wanted to. YUCA NOCHE said he (YUCA NOCHE) did not have anything (possibly narcotics) and that was why he (YUCA NOCHE) had not said anything to AVILA-DIAZ.
>
> YUCA NOCHE said he (YUCA NOCHE) wanted AVILA-DIAZ to gather money and he (YUCA NOCHE) would give AVILA-DIAZ 1/2 a kilo (possibly narcotics). YUCA NOCHE asked if AVILA-DIAZ understood, AVILA-DIAZ said yes. YUCA NOCHE asked why AVILA-DIAZ was going to pass him (YUCA NOCHE) the deals (customers), if AVILA-DIAZ needed to get money as well. AVILA-DIAZ said yeah. YUCA NOCHE said AVILA-DIAZ needed to get on it though and said he (YUCA NOCHE) had told AVILA-DIAZ to get his (AVILA-DIAZ) act together many times and AVILA-DIAZ did not care.
>
> YUCA NOCHE said he (YUCA NOCHE) sold 2 kilos in 2 weeks. AVILA-DIAZ said that was good. YUCA NOCHE said 2 kilos, but he (YUCA NOCHE) was not making much (profit) there. YUCA NOCHE said he (YUCA NOCHE) was just doing that dude (possibly YUCA NOCHE's source) a favor. AVILA-DIAZ said yeah. YUCA NOCHE said on this one (possibly new order) he (YUCA NOCHE) was on track (possibly going to make a profit). YUCA NOCHE said he (YUCA NOCHE) had not sold a little and said they (YUCA NOCHE and others) got out (sold) 2 kilos in 2 weeks. AVILA-DIAZ said it (possibly narcotics) got sold. YUCA NOCHE said a kid

---

[2] This is a non-verbatim account based upon an initial summary that was prepared by DEA linguists. As such, it is possible that there will be discrepancies between the description set forth above and any final transcripts that are prepared.

7

> *got 1/2 a kilo and said he (YUCA NOCHE) sold him (kid) 1/4 one week and another 1/4 the next week and so on.*
>
> *YUCA NOCHE said the "perico" (parrot, possibly narcotics) that he (YUCA NOCHE) had, he (YUCA NOCHE) was going to give it (perico, possibly narcotics) to AVILA-DIAZ at 18. AVILA-DIAZ said that was good (price). YUCA NOCHE said 18 (possibly 18,000) bucks and said that was what he (YUCA NOCHE) sold it (perico, possibly narcotics) for. AVILA-DIAZ asked if YUCA NOCHE gave it (perico, possibly narcotics) at that price on the block. YUCA NOCHE said no, he (YUCA NOCHE) would sell the 1/4 for 5,000, at 20 bucks. AVILA-DIAZ said that was good. YUCA NOCHE said he (YUCA NOCHE) gave the kilo at 20,000 bucks and 5,000 for the 1/4. AVILA-DIAZ said that was good. AVILA-DIAZ said okay and asked YUCA NOCHE to let him (AVILA-DIAZ) know. YUCA NOCHE said yes, and said his (YUCA NOCHE) buddy had called down there (Mexico) already and there was some (possibly narcotics) now. YUCA NOCHE said he (YUCA NOCHE's buddy) called 4 four days ago, but there was none (possibly narcotics). YUCA NOCHE said they (possibly narcotics) had not come down from that side (possibly Colombia per previous calls). YUCA NOCHE said they (possibly narcotics) had arrived now and they (possibly YUCA NOCHE's buddy's source and others) had picked them (possibly narcotics) up already. YUCA NOCHE said they (YUCA NOCHE and AVILA-DIAZ) had to wait for them (possibly YUCA NOCHE's buddy's source and others) to send it (possibly narcotics) over here (USA) now.*

7.     The foregoing summary is only a preliminary (and partial) summary/synopsis of the conversation between GALLARDO CASTRO and AVILA-DIAZ.

8.     I believe that the intercepted call summarized above involved a discussion of narcotics between YUCA NOCHE and AVILA-DIAZ. Based on my training, experience, and knowledge of this investigation, when AVILA-DIAZ asked YUCA NOCHE if he had "cooked already," I believe AVILA-DIAZ was asking if YUCA NOCHE had prepared (i.e., "cut") any narcotics such that they were ready for distribution. As described elsewhere in this affidavit, I know from my training and experience that drug traffickers often purchase "pure" narcotics that they later dilute (cut). Dilution allows a drug dealer to increase the amount of product he is able to sell, allowing him to earn greater profits. I believe that when YUCA NOCHE told AVILA-DIAZ that he "did not have any," he meant he did not have any narcotics to prepare for sale. When AVILA-DIAZ told YUCA NOCHE that the "dude was left without any product," I believe AVILA-DIAZ was saying that one of his customers would be without drugs ("product")

since YUCA NOCHE did not have any narcotics ready for AVILA-DIAZ to sell.

9. I further believe, based on my training, experience, and knowledge of this investigation, that when YUCA NOCHE said "they were going to bring him 3 kilos," he was saying that his supplier would give him three kilograms of narcotics. And I believe, based on my training, experience, knowledge of this investigation (including my controlled purchases of fentanyl from AVILA-DIAZ, which often occurred in one-ounce increments), and conversations with other experienced law enforcement officers, that when AVILA-DIAZ responded that "he had 3 whole ones for tomorrow," he meant he had plans to sell three ounces of narcotics the following day. Finally, I believe, based on my training and experience, that when AVILA-DIAZ told YUCA NOCHE that if he "got on it, he would sell that shit quickly with him," he meant that YUCA NOCHE should supply AVILA-DIAZ with narcotics so that AVILA-DIAZ could sell the drugs to his clients quickly to generate revenue for himself and YUCA NOCHE.

10. Based on my training, experience, and knowledge of this investigation, when YUCA NOCHE told AVILA-DIAZ that he had "sold 2 kilos in 2 weeks," I believe YUCA NOCHE meant more or less exactly what he said—that is, that he had sold two kilograms of narcotics in two weeks. And when YUCA NOCHE told AVILA-DIAZ that "a kid got ½ a kilo" after YUCA NOCHE "sold him ¼ one week and another ¼ the next week," I believe YUCA NOCHE meant that of the two kilograms of narcotics he had sold in the two-week time frame, he sold half of one kilogram to the same customer—one-quarter kilogram the first week and one-quarter kilogram the second week.

11. Based on my training and experience, I know that drug traffickers commonly refer to powder cocaine as "perico," which I know to be the Spanish word for parakeet. Thus, when YUCA NOCHE told AVILA-DIAZ he "was going to give [perico] to AVILA-DIAZ at 18," I believe YUCA NOCHE was saying he would sell AVILA-DIAZ one kilogram of cocaine for $18,000. I know from my training and experience that the price for one kilogram of cocaine in Northern California can range from approximately $19,000 to $27,000. When AVILA-DIAZ responded "that was good," I believe he was expressing approval for the price of $18,000 per

9

kilogram of cocaine.

12. I further believe that when AVILA-DIAZ asked YUCA NOCHE "if YUCA NOCHE gave [perico] at that price on the block," AVILA-DIAZ was asking whether YUCA NOCHE would sell cocaine on the street for $18,000 per kilogram. When YUCA NOCHE said "he gave the kilo at 20,000 bucks and 5,000 for the ¼," I believe he meant he would sell one kilogram for $20,000 and one-quarter kilogram for $5,000 on the street.

13. When YUCA NOCHE told AVILA-DIAZ that "there was some" narcotics in Mexico "now," having arrived recently from "that side," but that "they had to wait for them to send it over here now," I believe from my training, experience, and conversations with other experienced law enforcement officers, that he was informing AVILA-DIAZ that although narcotics had arrived in Mexico from Colombia, they had not yet crossed into the United States, let alone made their way to Northern California, and therefore YUCA NOCHE and AVILA-DIAZ had to wait for the narcotics to make it across the U.S./Mexico border and then up to Northern California.

14. On May 24, 2023, GPS ping location data from YUCA NOCHE's phone (510-491-6101), which law enforcement officers obtained pursuant to a warrant signed by Hon. Laurel Beeler in Case No. 3:23-mj-70691 LB, indicated that YUCA NOCHE traveled by car from San Francisco to Santa Ana, California, and that he remained there for approximately 24 hours before returning by car to the Tenderloin district of San Francisco, where GPS location data from his phone suggests YUCA NOCHE often resides.

15. Based on the fact that YUCA NOCHE told AVILA-DIAZ on May 15, 2023, that the narcotics had not yet arrived in the United States, and on the fact that YUCA NOCHE traveled to Southern California on May 24, 2023, before returning to San Francisco the next day, I believe, as informed by my training, experience, knowledge of this investigation, and discussions with other experienced law enforcement officers, that the purpose of YUCA NOCHE's trip to Southern California on May 24, 2023, was to pick up the narcotics he discussed with AVILA-DIAZ on May 15, 2023, and transport those narcotics back to the San Francisco

10

Bay Area. I know from my training and experience that it is common for high-level drug suppliers to reside in Mexico and to maintain a network of couriers and traffickers who transport large quantities of narcotics across the U.S./Mexico border, at which time the narcotics are stored at stash locations in Southern California (among other places) and distributed throughout the United States.

**C.     Identification of "YUCA NOCHE" as GALLARDO CASTRO; Offense Conduct**

16.    On June 1, 2023, at approximately 12 p.m., agents intercepted a call on TT1 between AVILA-DIAZ and YUCA NOCHE in which YUCA NOCHE said he would meet AVILA-DIAZ at AVILA-DIAZ's residence in Daly City, California, based on, among other things, GPS ping location data from TT1, a pole camera installed outside AVILA-DIAZ's house, and physical surveillance—where YUCA NOCHE said he and AVILA-DIAZ would "cook" more "rock," which I understand from my training and experience to mean prepare narcotics (specifically, in this case, cocaine) for sale. Agents subsequently used GPS location data to track (510) 491-6101, which agents suspect is used by YUCA NOCHE, to AVILA-DIAZ's house in Daly City and observed two Hispanic men enter the house at approximately 2:44 p.m. Agents then observed two Hispanic men depart the house at approximately 3:55 p.m. and drive away. Daly City police officers pulled over the car the two men were traveling in at approximately 3:58 p.m. after seeing that the car's registration was expired and that there was no front license plate on the car, each of which is a violation of California law.

17.    There were two men inside the car—AVILA-DIAZ, who was driving, and an unknown man who did not have any identification on him in the front passenger seat. The officers determined that AVILA-DIAZ was on probation and asked him if they could search the car. When AVILA-DIAZ consented to the search, officers found what they suspected to be cocaine in the front center console. The officers then detained the two men and searched them and the rest of the car. The officers found, among other things, approximately 140 grams of what they suspected to be cocaine in a bag in the unknown man's possession.

18.    An officer called TT1 and two officers then saw a phone in AVILA-DIAZ's

possession ring, confirming AVILA-DIAZ had a phone assigned that number in his possession. An officer also called (510) 491-6101, the number suspected to belong to YUCA NOCHE, and saw a phone in the unknown man's possession ring, confirming that man was YUCA NOCHE.

19. When officers asked YUCA NOCHE for his identification, he told them he did not have it on him but that his wife had a photo of his ID that she could send to the officers. YUCA NOCHE provided his wife's phone number as XXX-XXX-2221, a number associated with a woman agents identified as Y.B. Officers called Y.B., who told the officers she would text them a photograph of YUCA NOCHE's ID. Shortly thereafter, Y.B. sent a photograph of YUCA NOCHE's identification—a Mexican voter ID card bearing a photograph of a man who resembles YUCA NOCHE and identifying him as Yobani Aminadab GALLARDO CASTRO.

20. In light of the foregoing, and based on my training and experience and on the totality of the circumstances, I believe GALLARDO CASTRO is YUCA NOCHE—*i.e.*, the person using the phone assigned call number (510) 491-6101 and working with AVILA-DIAZ, perhaps among others, to traffic narcotics, including fentanyl and cocaine, in the Northern District of California.

## SEALING REQUEST

21. Based on my training and experience, the disclosure of the existence of this Affidavit, the Complaint, arrest warrant, and/or all related documents may cause GALLARDO CASTRO's co-conspirators, known and as-yet unknown, to destroy evidence or to conceal ongoing criminal activity, jeopardizing the progress of this ongoing investigation. The disclosure of these documents may also cause co-conspirators to flee from prosecution. I therefore request that the Court seal this Affidavit, the Complaint, the summons and arrest warrant, and all related documents.

## CONCLUSION

22. Based on the facts set forth in this affidavit, specifically that on June 1, 2023, GALLARDO CASTRO possessed approximately 140 grams (gross) of cocaine while in a car that was stopped in San Mateo, California, I believe there is probable cause to believe

GALLARDO CASTRO possessed with intent to distribute a mixture or substance containing a detectable amount of cocaine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C), in the Northern District of California.

/s/ *Connor R. Hooper*
CONNOR R. HOOPER
Special Agent
Drug Enforcement Administration

Sworn to before me over the telephone and signed by me pursuant to Fed. R. Crim. P. 4.1 and 4(d) on this 2nd day of June 2023.

HON. SALLIE KIM
UNITED STATES MAGISTRATE JUDGE